SLR:LDM:WJG

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**CV13-3349**

- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

          Plaintiff,

    - against -

FOUR HUNDRED THIRTY-FOUR THOUSAND SIX
HUNDRED SIXTEEN DOLLARS AND FIFTY-FIVE
CENTS ($434,616.55) FORMERLY ON DEPOSIT
IN FIRSTRADE SECURITIES, INC., ACCOUNT
NUMBER 882-17331-13 FORMERLY HELD IN THE
NAME OF YA-JU HSU, AND ALL PROCEEDS
TRACEABLE THERETO, and

THE REAL PROPERTY AND PREMISES LOCATED
AT 82-34 TRYON PLACE, JAMAICA ESTATES,
NEW YORK 11432,

          Defendants In Rem.

- - - - - - - - - - - - - - - - - - - X

Verified Complaint
In Rem

Civil Action No.

_IRRY, J_

ORENSTEIN, M.J.

        Plaintiff, UNITED STATES OF AMERICA, by its attorney,
LORETTA E. LYNCH, United States Attorney for the Eastern
District of New York, William J. Gullotta, Assistant United
States Attorney, of counsel, alleges upon information and belief
as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff brings this civil action in rem in
order to condemn and forfeit to the use and benefit of the
United States of America the following property: (a) four
hundred thirty-four thousand six hundred sixteen dollars and
fifty-five cents ($434,616.55) formerly on deposit in Firstrade
Securities, Inc., Account Number 882-17331-13 in the name of Ya-
Ja Hsu (the "Subject Account"), now in the custody of the United
States Treasury Department, and all proceeds traceable thereto
(the "Defendant Funds"); and (b) the real property and premises
located at 82-34 Tryon Place, Jamaica Estates, New York 11432,
also referenced with the Clerk of the County of Queens under
Section 32, Block 7239, Lot 53 (the "Tryon Place Property")
(collectively, the "Defendants in rem").

2.    The funds formerly held in the Subject Account
were held by the Queens County District Attorney's Office
("Queens DA") pursuant to a seizure warrant executed by that
office.  Upon the Court's issuance of a Federal seizure warrant,
the Queens DA released the funds seized from the Subject Account
to the United States Treasury Department.

3.    Plaintiff seeks the forfeiture of the Subject
Account pursuant to Title 18 U.S.C. § 981(a)(1)(A), as property
involved in money laundering transactions in violation of Title
18 U.S.C. §§ 1956 or 1957, or traceable thereto, and pursuant to

Title 18 U.S.C. § 981(a)(1)(D) as monies which represent or are traceable to proceeds of (a) theft or bribery in violation of Title 18 U.S.C. § 666(a)(1)(B) and/or (b) mail and wire fraud in violation of Title 18 U.S.C. §§ 1341 and 1343.

4.  Plaintiff seeks the forfeiture of the Tryon Place Property pursuant to Title 18 U.S.C. § 1594(e), as property used or intended to be used to commit or to facilitate the commission of forced labor offenses under 18 U.S.C. § 1589.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over this action, pursuant to 28 U.S.C. §§ 1345 and 1355.

6.  Venue in the Eastern District of New York is proper, pursuant to 28 U.S.C. §§ 1355 and 1395 and 18 U.S.C. § 981(h), in that some of the acts and omissions giving rise to the forfeiture occurred in, and the Defendants in rem are found in, the Eastern District of New York.

## STATUTORY BASIS FOR FORFEITURE

7.  Title 18, United States Code, § 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957, or 1960 of this title, or any property traceable to such property."  In addition, Title 18, United States Code, Section 981(a)(1)(D) subjects to forfeiture any property, real or personal, which represents or is traceable to

3

the gross receipts obtained, directly or indirectly, from a violation of Section 666 (a)(1) (theft or bribery concerning Federal programs), Section 1341 (mail fraud) or Section 1343 (wire fraud) of Title 18.  Finally, Title 18, United States Code, Section 1594(e) subjects to forfeiture "[a]ny property, real or personal, used or intended to be used to commit or to facilitate the commission of any violation of [Section 1589 (forced labor)]."

### THE INVESTIGATION

8.   CECILIA CHANG ("CHANG"), the former Dean of the Center for Asian Studies and Vice President of International Relations at St. John's University ("St. John's"), which is located in Jamaica, New York, abused her positions at St. John's to, *inter alia*, commit extensive financial fraud through multiple fraudulent schemes and to force international scholarship students to act as her personal servants by having them perform menial personal labor for CHANG's benefit.

9.   Beginning in or about June 2010, the Internal Revenue Service — Criminal Investigations ("IRS-CI"), the Federal Bureau of Investigation ("FBI"), and the Queens DA conducted an investigation of CHANG that revealed extensive fraud committed against St. John's, primarily through CHANG's submission of fraudulently altered expense vouchers.  This investigation also uncovered a scheme to defraud a Saudi Arabian

4

charitable and philanthropic organization – the Alwaleed bin Talal Foundation (the "Alwaleed Foundation") – in which CHANG created a sham foundation called the Global Development Initiative Foundation ("GDIF") to facilitate her fraud. Finally, the investigation also revealed a manipulative and illegal scheme in which CHANG recruited students, many from foreign countries, to attend St. John's by arranging scholarships for these students, and then forced them to act as CHANG's own personal servants by threatening them with serious harm, including but not limited to the termination of their scholarships.

10.   As discussed in greater detail below, CHANG's fraudulent schemes were highly profitable.  The investigation of CHANG revealed that the fraud she orchestrated against St. John's and the Alwaleed Foundation generated in excess of $1,000,000.00 of fraudulent proceeds, and most of these proceeds were used for CHANG's personal benefit and/or the benefit of her son, Steven Chang.  Moreover, CHANG profited by her forced labor scheme in that she benefitted from the labor and services of students who were afraid they would lose their scholarships if they did not perform work as CHANG's personal servants.

11.   As a result of this investigation, CHANG was indicted by both federal and state grand juries.

5

## THE FEDERAL INDICTMENT

12. On February 10, 2012, a Grand Jury sitting in the Eastern District of New York returned a ten-count indictment against CHANG in connection with her involvement in the fraudulent activity described above. United States v. Chang, No. 11-CR-0067 (S-2)(SJ). Specifically, CHANG was charged with: (a) theft or bribery in violation of Title 18 U.S.C. § 666(a)(1)(B); (b) forced labor in violation of Title 18 U.S.C. §§ 1589(a) and 1589(d); (c) subscribing to false tax-related filings in violation of Title 26 U.S.C. § 7206(1); (d) attempting to interfere with the due administration of the Internal Revenue Laws in violation of Title 26 U.S.C. § 7212(a); and (e) making false statements in violation of Title 18 U.S.C. § 1001(a)(2). The indictment also included forfeiture allegations providing notice that, upon conviction, the United States intended to seek the forfeiture of: (a) any property that constituted or was derived from proceeds obtained directly or indirectly as a result of the charged fraud offenses, and (b) any property that was used or intended to be used to commit or to facilitate the commission of a forced labor violation, including but not limited to the sum of $1,000,000.00. CHANG committed suicide during her Federal criminal trial, which preceded the State trial.

6

## THE STATE INDICTMENT

13.   In or about September 2010, a Grand Jury sitting in Queens County in the State of New York returned a two-hundred-and-five-count indictment against CHANG in connection with her involvement in fraudulent activity, as described above. Specifically, CHANG was charged with multiple counts of grand larceny in the first degree, multiple counts of grand larceny in the second degree, multiple counts of attempted grand larceny in the second degree, multiple counts of forgery in the second degree, multiple counts of criminal possession of a forged document in the second degree, and multiple counts of falsifying business records in the first degree.

## THE ST. JOHN'S SCHEME

14.   From in or about 1982 to 2010, CHANG was the Dean of the St. John's Center for Asian Studies, and from in or about 1992 to 2010, CHANG was the Vice-President for International Relations at St. John's.

15.   At all times relevant to the events described herein, St. John's received, in any one year period, benefits in excess of $10,000.00 under one or more Federal programs involving a grant, contract, subsidy, loan, guarantee, insurance or other form of federal assistance.

16.   In her capacity as Dean of Asian Studies and Vice-President for International Relations at St. John's, CHANG

was primarily responsible for soliciting donations and recruiting scholarship students from Far East Asia for the university.

17. In order to facilitate her duties as Dean and Vice-President, it was the practice of St. John's to reimburse CHANG for business-related expenses. CHANG used several credit cards, including personal credit cards and credit cards issued by St. John's, some of which were issued by Taishin Bank in Taiwan. CHANG was authorized to be reimbursed for travel and entertainment expenses only when these expenses pertained to her official duties at St. John's. After incurring expenses, CHANG submitted credit card statements and receipts to St. John's for reimbursement. Along with the respective bills, receipts and/or statements, CHANG also regularly included a written explanation of each expense, indicating how the expense purportedly related to legitimate university-related business. Upon review and approval of each request for reimbursement, St. John's reimbursed CHANG by check or direct deposit into accounts controlled by CHANG.

18. However, the investigation of CHANG revealed that in addition to the reimbursement of CHANG's legitimate university-related expenses, CHANG caused St. John's to reimburse her extensively for personal (non-business) expenses and fictitious expenses that were never incurred. For example,

8

from in or about May 2003 through in or about September 2009, CHANG, along with several employees and students, all of whom worked at CHANG'S direction, fraudulently altered CHANG's credit card statements to fabricate credit card expenses.  These altered credit card statements were then submitted to St. John's to claim in excess of $1,000,000.00 to which CHANG had no lawful claim or interest.

19.  CHANG accomplished this fraudulent reimbursement scheme by instructing her employees and scholarship students to photocopy credit card documents and alter the documents by writing in fictitious expenses and/or phony justifications to make these documents appear to be legitimate university-related expenses.  The altered documents were then submitted to St. John's for reimbursement, causing St. John's to compensate CHANG for these personal and/or fictional expenses.

20.  CHANG also had credit cards issued to her son, Steven Chang.  Steven Chang used these credit cards to make purchases for himself, which CHANG disguised as university-related expenses on the documents she submitted to St. John's, causing St. John's to pay thousands of dollars for Steven's personal expenses, including a vacation to Hawaii.

21.  During the course of the investigation, law enforcement agents interviewed a cooperating witness ("CW-1"), one of CHANG'S employees, who admitted to his/her involvement in

the fraudulent reimbursement scheme.  In essence, when interviewed, CW-1 stated to law enforcement agents that on numerous occasions at the direction and supervision of CHANG, CW-1 altered CHANG's Taishin Bank documents for the purpose of making CHANG's personal expenses appear to be legitimate university-related business expenses when in fact, they were not.  Thereafter, these altered documents, along with false written explanations to legitimize the altered bank documents, were submitted to St. John's for processing.  Based on these fraudulent documents, CHANG was subsequently paid hundreds of thousands of dollars to reimburse her for expenses unrelated to St. John's University business.

22.  CW-1 also informed law enforcement agents that, on numerous occasions, CW-1 observed CHANG directing other employees to alter CHANG's Taishin Bank documents for the purpose of making CHANG's personal expenses appear to be legitimate university-related business.

23.  CW-1's information was corroborated, in part, by documents obtained by law enforcement agents during the course of this investigation.  Specifically, many documents were recovered by St. John's officials from CHANG's office at St. John's.  Among the documents recovered were original and altered versions of CHANG's Taishin Bank credit card statements, as well

10

as handwritten instructions as to how to alter the bank documents.

24. After a review of these documents, law enforcement agents determined that the photocopied Taishin Bank credit card documents that CHANG submitted to St. John's for expense reimbursement had been altered and did not match the statements generated by Taishin Bank. Indeed, these Taishin Bank documents further revealed that CHANG had submitted numerous fraudulent documents to St. John's in order to be reimbursed for expenses that were never incurred on behalf of the university. The personal expenses disguised on CHANG's credit card statements included, among other things, tens of thousands of dollars in credit card charges relating to shopping and restaurants, purchases at wine and liquor stores, casino expenses, and law school tuition for her son, Steven Chang, who was attending St. John's law school. Prior to submitting these documents for reimbursement, CHANG instructed employees and/or students to alter the amounts of these expenses as well as the names of the businesses associated with them.

25. An analysis by law enforcement of documents relevant to CHANG's scheme revealed that during the years 2003 through 2009, CHANG submitted in excess of fifty (50) altered credit card statements to St. John's for reimbursement, and as a result CHANG fraudulently caused St. John's to reimburse her in

11

excess of $1,000,000.00 for expenses that were not related to university business.

26. When St. John's paid CHANG for a fraudulent expense, CHANG either deposited a check or caused an electronic deposit of funds into her bank account at Asia Bank, Account Number ****-*6739 (the "Asia Account"). CHANG opened this account on or about June 3, 2003 and was the sole signatory. Based on an analysis of the Asia Account, law enforcement agents determined that during the period from 2003 through 2009, in excess of $1,000,000.00 was deposited into the Asia Account via check or electronic transfer from St. John's as a result of the fraudulent reimbursement scheme.

27. After depositing the proceeds of her fraudulent scheme into the Asia Account, CHANG then transferred a portion of the proceeds from the Asia Account to an account at Firstrade Securities, Inc., account number ***-***22-15 in the name of Yu-Wei Tung (the "Tung Account"), another account controlled by CHANG. Firstrade Securities records reveal the address listed for the Tung Account is 8000 Utopia Parkway, Jamaica, NY 11439 c/o Center of Asia Studies. This is the address of a university building at St. John's.

28. During this investigation, law enforcement agents determined that the Tung Account was utilized by CHANG as a nominee account for the purpose of laundering the proceeds of

12

her fraudulent reimbursement scheme. This conclusion is based, in part, on an interview with Mr. Tung, during which Mr. Tung stated to law enforcement agents, in sum and substance, that he resides in Taiwan and never attended St. John's University in Jamaica, New York, although he knows who CHANG is because they were previously classmates years ago in Taiwan. In addition, Mr. Tung stated that he never authorized CHANG to open an account in his name at Firstrade Securities and had no knowledge of the Tung Account. Mr. Tung also stated that he never authorized any financial transactions to be conducted relating to the Tung Account.

29. During the course of this investigation, law enforcement agents also interviewed Julie Ku, the Chief Administrative Officer at Firstrade Securities, Inc. ("Firstrade"). During that interview, Ms. Ku stated, in sum and substance, that she knew that CHANG was a Vice-President at St. John's and a customer of Firstrade Securities. Ms. Ku stated that she executed transactions on behalf of CHANG involving the Tung Account and deposited checks into the Tung Account on behalf of CHANG. Moreover, Ms. Ku stated that she never had any contact with Yu-Wei Tung. Finally, Ms. Ku stated that in January 2007 at the direction of CHANG, Ms. Ku transferred funds from the Tung Account to Firstrade account number 882-17331-13

held in the name of Ya-Ju Hsu (the "Subject Account"), an
account discussed in greater detail below.

### FRAUDULENT DONATION SCHEME

30. In addition to the fraudulent reimbursement
scheme perpetrated against St. John's, CHANG devised a scheme to
defraud the Alwaleed Foundation by using a sham foundation.
GDIF was created and used for the purpose of committing fraud by
soliciting donations under the pretext of charitable,
educational, and other non-profit efforts.

31. According to the New York Department of State,
Division of Corporations, GDIF is a Domestic Not-for-Profit
Corporation. It was established on or about August 2, 2007 in
the County of Queens. Although no Registered Agent is listed,
the address to serve process is the Tryon Place Property.

32. On or about June 24, 2008, CHANG opened account
number *****4447 at Asia Bank, N.A., in the name of GDIF (the
"GDIF Account"). The GDIF Account listed CHANG as the sole
signatory, and the signature card further identified CHANG as
the President and GDIF as a foundation.

33. As a part of the GDIF scheme, CHANG contacted the
Alwaleed Foundation to fraudulently attempt to solicit donations
allegedly on behalf of St. John's. CHANG represented to the
Alwaleed Foundation that any donations made to GDIF would be
used, *inter alia*, to fund certain projects at St. John's,

14

including (a) a lecture series relating to various Asian and/or multi-cultural educational topics and (b) certain language courses not offered at St. John's, including Arabic for business students.

34.  Contrary to CHANG's representations to the Alwaleed Foundation, GDIF had no affiliation with St. John's, and CHANG had no intention of coordinating any donations to GDIF with St. John's or of using any donations to GDIF for the two above-stated purposes.

35.  In or about July 2008, in reliance on CHANG's fraudulent misrepresentations, the Alwaleed Foundation agreed to make a charitable donation of approximately $250,000.00 to GDIF.

36.  On or about July 8, 2008, a wire transfer in the amount of $249,980.00 was credited to the GDIF account from an account in the name of H.R.H. Alwaleed Talal A. Alsaud to satisfy the aforementioned charitable donation.  The originating financial institution was recorded as Samba Financial Group, located in Riyadh, Saudi Arabia.

37.  During the course of the investigation, law enforcement agents interviewed another cooperating witness ("CW-2") who admitted his/her involvement in the fraudulent donation scheme.  CW-2 stated to law enforcement agents, in sum and substance, that one of his/her responsibilities while working for CHANG was to write letters and emails which were sent to

15

Prince Alwaleed bin Talal Alsaud of Saudi Arabia to solicit donations from the Alwaleed Foundation. CW-2 further stated that the emails were written from CHANG's email account at St. John's. The emails falsely indicated that GDIF was affiliated with St. John's University, and that any money donated to GDIF would be used to fund the activities at St. John's described above.

38. In addition, CW-2 stated that at CHANG's direction and supervision, he/she printed numerous fliers that were mailed to the Alwaleed Foundation and indicated that a lecture series at St. John's, purportedly funded by the Alwaleed Foundation's donation, had occurred. Despite the representations in these emails and fliers, CW-2 confirmed to law enforcement agents that the fliers were false and that the purported lecture series at St. John's had not taken place. Further, CW-2 stated that no lecture series associated with either GDIF or the Alwaleed Foundation had ever taken place or been planned.

39. CW-2's information was corroborated, in part, by information law enforcement agents received from both the Alwaleed Foundation and St. John's. Further, the information obtained from the General Counsel at St. John's revealed that GDIF is not affiliated with St. John's. St. John's also

16

confirmed that they never received any donations from either
GDIF or the Alwaleed Foundation.

## THE SUBJECT ACCOUNT

40.  On or about January 22, 2007, the Subject Account
was opened at Firstrade Securities, Inc. in the name of Ya-Ju
Hsu ("Hsu"). Hsu is a former St. John's student who was
recruited by CHANG, received a scholarship to attend St. John's,
and, on that basis, moved from Taiwan to Queens, New York to
attend St. John's. As with the Tung Account, the address
associated with the Subject Account is 8000 Utopia Parkway,
Jamaica, NY 11439.

41.  Hsu is associated with the Subject Account in
name only and is a nominee owner on the account, which was
controlled by CHANG. CHANG regularly made deposits and
withdrawals, which demonstrates CHANG's control over the
account. The investigation revealed that CHANG opened the
Subject Account, utilizing Hsu's name as a nominee, so that
CHANG could launder the proceeds of, *inter alia*, the St. John's
and GDIF schemes while attempting to conceal and disguise the
true source and ownership of the fraudulently obtained funds.

42.  During the course of the investigation, law
enforcement agents interviewed Hsu. When interviewed, Hsu
stated that she opened the Subject Account on behalf of CHANG at
CHANG's direction. Hsu further stated that at some point after

17

becoming a student at St. John's, she was taken to CHANG's office by another student to complete some administrative paperwork. At that time, she was given paperwork to fill out and was told she also needed to open a bank account. Hsu stated that she signed all of the forms and returned them to CHANG and never went to Firstrade Securities or any other bank to open the account. Hsu further stated that she believed that opening this account was a requirement of the school, that she never used the account personally, and that she never had the password to the account.

43. In addition, Hsu stated that at some point after returning to Taiwan, she received a phone call from CHANG who informed her that CHANG was having trouble accessing the Subject Account and that CHANG needed Hsu to have the password re-set. According to Hsu, this was when she first learned there was an account in her name at Firstrade Securities.

44. During this investigation, law enforcement agents interviewed another cooperating witness ("CW-3"). During the interview, CW-3 stated that on or about January 15, 2008, he/she began working as CHANG's assistant at St. John's University. He/she stated his/her responsibilities included booking flights, making hotel reservations, answering emails, and conducting online banking transactions for CHANG. CW-3 also stated that at CHANG's direction, he/she conducted transactions within the

18

Subject Account on numerous occasions and it appeared that all of the work performed for CHANG seemed related to CHANG's personal affairs and was unrelated to St. John's.

45.  Based on the government's investigation, it was determined that CHANG transferred a portion of the proceeds of the aforementioned illegal activity into the Subject Account during the period from on or about January 30, 2007 to on or about September 9, 2009. The transfer of these funds into the Subject Account demonstrated CHANG's attempt to further her unlawful activity and launder the proceeds through this account.

46.  The chart below sets forth the dates, amounts and the source of several transfers by CHANG into the Subject Account during this period:

| Transaction Date | Transaction Amount | Transaction Type | Source Account |
|---|---|---|---|
| 01-30-07 | $176,952.00 | Wire Transfer | Tung Account |
| 10-14-08 | $30,000.00 | Check #104 | GDIF Account |
| 10-31-08 | $24,500.00 | Check #1243 | Asia Account |
| 11-17-08 | $19,000.00 | Check #1254 | Asia Account |
| 11-21-08 | $10,206.95 | Check #1257 | Asia Account |
| 09-09-09 | $6,000.00 | Check #1369 | Asia Account |
| 09-09-09 | $10,500.00 | Check #1371 | Asia Account |
| 09-09-09 | $3,500.00 | Check #1037 | GDIF Account |
|  |  |  |  |
| Total | $280,658.95 |  |  |

47. On or about January 31, 2013, U.S. Magistrate Judge Joan M Azrack issued a seizure warrant for the Defendant Funds found in the Subject Account. On or about January 31, 2013, law enforcement agents executed the warrant and seized the Defendant Funds, which are now in the custody of the United States Treasury Department.

## FORCED LABOR SCHEME

48. As mentioned above, CHANG also abused her positions as Dean and Vice President at St. John's by forcing scholarship students to act as her personal servants. CHANG forced these students to be her servants by threatening to take away their scholarships if they did not obey her demands.

49. In her capacity as Dean and Vice President, CHANG had the authority to issue scholarships which would cover the cost of tuition at St. John's. In exchange for these scholarships, students were required to perform university-related work for approximately twenty (20) hours per week at the direction of the Dean of the Center for Asian Studies at St. John's, i.e. CHANG. CHANG also had the authority to revoke these scholarships.

50. During her tenure as Dean and Vice President, CHANG recruited many students for these scholarships from East Asia, primarily China and Taiwan. Many of these students came from poor families and, without a scholarship, they did not have

the financial means to obtain a degree from a respected American university such as St. John's.

51.    Rather than arrange university-related work opportunities for these scholarship students, CHANG instead forced many students to perform labor for CHANG personally at her home at the Tryon Place Property.  Among other things, CHANG directed these students to act as CHANG's personal servants and perform numerous tasks, such as cooking, cleaning, and laundry. Further, CHANG routinely had at least one student working at the Tryon Place Property each day of the week, and often there were multiple students working there at the same time.

52.    During the course of the investigation, law enforcement officials identified another cooperating witness ("CW-4").  In approximately 2004, CHANG offered CW-4 a scholarship to attend St. John's and CW-4 accepted.  After being awarded the scholarship, CW-4 came to the United States from China to attend St. John's.  CW-4 and her family could not have afforded the cost of tuition at St. John's without a scholarship.

53.    CHANG also arranged to be CW-4's sponsor to facilitate CW-4's student visa application.  CW-4 believed that he/she could not study in the United States without CHANG as her sponsor.

54. Almost immediately after CW-4 arrived in the
United States, CHANG put CW-4 to work as CHANG's personal
servant, ordering CW-4 to perform many personal chores, such as
cooking, cleaning, vacuuming, mopping, dishwashing, clothes
washing, and garbage removal. This work was performed by CW-4
for CHANG at the Tryon Place Property. During the summer of
2004, CW-4 worked seven days per week at the Tryon Place
Property performing these household tasks, including cooking
breakfast, lunch, and often dinner for CHANG and her son, Steven
Chang. On the days when CHANG was home, CW-4 was not permitted
to leave the Tryon Place Property until CHANG determined CW-4's
work had been completed.

55. Later in 2004, CHANG arranged for CW-4 to move
into the Tryon Place Property. Once CW-4 began to live at
CHANG's home, CHANG demanded more work from CW-4. CW-4 often
worked in excess of 20 hours per week.

56. CW-4 was also required to retrieve personal items
from the Tryon Place Property for CHANG on multiple occasions
and bring them to CHANG at multiple locations.

57. CHANG instructed CW-4 not to disclose to anyone
at St. John's the work CW-4 and other students performed at the
Tryon Place Property.

58. The work CHANG forced CW-4 and other scholarship
students to perform was tiring, difficult, and demeaning, and

22

CW-4 as well as many other students did not want to do this
work. Nevertheless, CW-4, like many other students, continued
working for CHANG because CHANG threatened to terminate his/her
scholarship if he/she did not comply. Indeed, the fear of
losing his/her scholarship was the only reason CW-4 continued to
work for CHANG at the Tryon Place Property.

59. During the course of the investigation, law
enforcement officials interviewed another cooperating witness
("CW-5"). CW-5 was a student who received a scholarship to St.
John's through CHANG's program.

60. Beginning in or about 2009, CW-5 worked as
another housekeeper for CHANG at the Tryon Place Property. CW-5
was required to, among other things, cook, wash both CHANG's and
Steven Chang's clothes, vacuum, mop, and perform other household
tasks at the Tryon Place Property. CW-5 performed this work
because CHANG made CW-5 believe that if CW-5 did not do the work
CHANG demanded of him/her, then CHANG would terminate his/her
scholarship.

61. While working at the Tryon Place Property, CW-5
developed an allergy to dust mites. After CW-5 informed CHANG
of the allergy, CHANG told CW-5 that he/she still had to
continue to work at the Tryon Place Property until another
student was assigned to perform CW-5's work. No replacement was
found for months, yet CW-5 nevertheless was compelled to

23

continue working at the Tryon Place Property because he/she was afraid that, if he/she stopped working there, CHANG would have taken away his/her scholarship.

62.  CW-5, like many other students, was also required to perform household work for CHANG's son, Steven Chang, at the Tryon Place Property.  On one occasion at the Tryon Place Property, CW-5 was bitten by Steven's dog on CW-5's left toe and right buttocks.  Steven Chang watched and laughed as the dog bit CW-5 while CW-5 screamed and cried.  After CW-5 cleaned his/her wounds, Steven Chang yelled at CW-5 and ordered CW-5 to clean Steven's room and wash his laundry.  CW-5 continued to perform this work for Steven Chang because he/she was afraid of losing his/her scholarship.

63.  When CW-5 finished his/her work for Steven Chang, CW-5 went to the hospital and received vaccination injections and further care for his/her wounds.  When CW-5 told CHANG about this incident, CHANG told CW-5 he/she should not have gone to the hospital.

64.  CW-4 and CW-5 were not the only students who performed household work for Steven Chang.  CHANG also ordered many other scholarship students to cook and clean for Steven Chang and his girlfriend at the Tryon Place Property.  While working for Steven Chang, the students were subjected to abusive and hostile behavior.  These students believed that if they

24

failed to perform this work for Steven Chang, they would lose their scholarships.

65.  CHANG told many of the students who worked for her that she was the "boss," and that the students should not tell anyone that they worked for CHANG as her housekeepers.

66.  CHANG also knowingly obtained the labor and services of many other St. John's students.  CW-4, CW-5, and others like them felt that, if they did not act as CHANG's personal housekeepers, they would lose their scholarships and visas.  As a result, these students would be forced to leave the United States without a degree, thereby suffering serious psychological, financial, and reputational harm.  Based on her position at St. John's, CHANG was aware that many of these students came from very modest backgrounds and circumstances, and CHANG took advantage of their situations.

## FIRST CLAIM FOR RELIEF

67.  Plaintiff repeats the allegations of paragraphs 1 through 66 as if fully set forth herein.

68.  The Defendant Funds up to and including two hundred eighty thousand six hundred fifty-eight dollars and ninety-five cents ($280,658.95), and all proceeds traceable thereto, constitute property which represents or is traceable to violations of Title 18 U.S.C. §§ 666(a)(1), 1341 and 1343.

25

69.   As a result of the foregoing, the Defendant Funds up to and including two hundred eighty thousand six hundred fifty-eight dollars and ninety-five cents ($280,658.95), and all proceeds traceable thereto, are liable to condemnation and to forfeiture to the United States in accordance with Title 18 U.S.C. § 981(a)(1)(D).

### SECOND CLAIM FOR RELIEF

70.   Plaintiff repeats the allegations of paragraphs 1 through 66 as if fully set forth herein.

71.   The Defendant Funds, and all proceeds traceable thereto, were involved in or traceable to transactions in violation of 18 U.S.C. §§ 1956 and 1957.

72.   As a result of the foregoing, the Defendant Funds and all proceeds traceable thereto, are liable to condemnation and to forfeiture to the United States in accordance with Title 18 U.S.C. § 981(a)(1)(A).

### THIRD CLAIM FOR RELIEF

73.   Plaintiff repeats the allegations of paragraphs 1 through 66 as if fully set forth herein.

74.   The Tryon Place Property was used or intended to be used to commit or to facilitate the commission of a violation of 18 U.S.C. § 1589 (forced labor).

75.  As a result of the foregoing, the Tryon Place Property is liable to condemnation and to forfeiture to the United States, in accordance with Title 18 U.S.C. § 1594(e).

**WHEREFORE**, plaintiff, United States of America, requests that a warrant of this Court be issued for the arrest of the Defendants in rem; that due notice of these proceedings be given to all interested persons; that the Defendants in rem be forfeited and condemned to the use of the United States of America; that the plaintiff be awarded its costs and disbursements in this action; and for such other relief and further relief as this Court deems just and proper.

Dated:     Brooklyn, New York
           June 12, 2013

                              LORETTA E. LYNCH
                              UNITED STATES ATTORNEY
                              Eastern District of New York
                              Attorney for Plaintiff
                              271 Cadman Plaza East
                              Brooklyn, New York 11201

By:

                              WILLIAM J. GULLOTTA
                              Assistant U.S. Attorney
                              (718) 254-6148

27

## VERIFICATION

Sheldon Tang, hereby declares as follows:

1.   I am a Special Agent with the Internal Revenue Service.

2.   I have read the within Verified Complaint in Rem and know the contents thereof.

3.   I believe the matters contained in the within Verified Complaint in Rem are true and accurate to the best of my knowledge, information and belief.

4.   The source of my information and the grounds for my belief are personal knowledge and information provided by other law enforcement officers and the official files and records of the United States of America.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:   Brooklyn, New York
         June __, 2013

         _____
         SHELDON TANG
         Special Agent
         Internal Revenue Service

28